We welcome you here. We're working on the night shift. It hopefully gave you a little more time to prepare your arguments. It certainly helped us out, so we'll ask lots of questions. Please be aware that we will enforce the traffic light system. It's a little loud, isn't it? And when the yellow light comes on, you have two minutes. When the red light comes on, please conclude your argument unless you are answering a question from the court. We have read your briefs. We've looked at the record excerpts. We have not necessarily read the entire record, so we'll appreciate your citations when those are appropriate. With that, the first case of the morning-afternoon is No. 16-10289, United States v. Spalding. Mr. Newman. Mr. Newman May it please the Court. The United States sentencing guidelines were enacted to achieve two goals. Uniformity of sentences amongst defendants that are charged with similar criminal conduct across the United States and proportionality between the conduct of an individual defendant and the sentence that is ultimately imposed. In this case, the district court ignored those goals when it decided to utilize the previous year's sentencing guideline manual in assessing the sentence or calculating the advisory guideline sentence for Mr. Spalding. The judge made a bargain on that, didn't he? I mean, didn't he grant a continuance in return for a concession that he could use the old guidelines? That is correct. That was a condition upon the continuance. However, if the court had sentenced him in October of 2015, I don't think there would be error. But because the court did not sentence him until March of 2016, the 2015 guideline would have been mandatory under 3553, 1B111 of the United States sentencing guidelines. And additionally, the overall spirit as set forth in 3742 of Title 18. What's clear is the guidelines are meant to be that beginning guidepost. It's when the court begins to look at what the proportionality of the defendant's conduct means. And so year to year, the Sentencing Commission compiles data in order to update and amend the guidelines to better achieve those first two goals. But this isn't even plain error. This is something relinquished. Well, in order for this court to find a waiver, the court would have to find three things. First, that this is a right of the defendant as opposed to an obligation of the court. Second, that it can be waived by the attorney as opposed to the client himself. And finally, that the conduct or the language used by the attorney in this case was sufficient to relinquish that right. I think that there are a number of issues presented here. As the Supreme Court stated in New York v. Hill, the gravity of a right is how the court should determine what actions are necessary to waive it. This is not simply an issue of calendaring. This is overall the entire scope of a sentencing proceeding. It begins at the very beginning by the probation officer utilizing the guidelines manual that is in effect on the day of the sentencing. It begins with an advisory guideline range, and the court- You know what? We know what the procedures are. Understood, Judge. What's your point? Well, my point was that this is the lodestar. This is the beginning. This is where the court has to begin. Well, it is a lodestar, but they change them every two or three years. So there's only a limited profit from that. It must have been – obviously, Judge Lynn was aware that the guidelines on the amount of loss were going to change. Apparently, your client was aware of that, or at least the trial counsel was aware of that. And so when she asked that, trial counsel didn't say, what do you mean? What's that got to do with anything? Instead, he said, oh, yes, of course, we want the continuance. And I'm not going to deny that there was a Hobson's choice made. The only issue, I believe, is whether or not the attorney himself had the ability to waive it, or even if it's a right of the defendant as opposed to an obligation of the court, because this is the foundation that the federal sentencing guidelines require, is that they begin in a certain way. Your time is going to be thin on this one. I mean this would hurt your client and almost every defendant always that wanted more time before sentencing to cooperate if there were a rule that you could not continue past it. So this would be quite far-reaching to say defendants couldn't even request a continuance. But anyway, you can keep going on it. You've got some other arguments that interested me more. Yes. Well, ultimately the way I wanted to phrase that, and I'll wrap it up very shortly, was as far as this goes, it's not necessarily that the continuance shooter should not have been granted. It's that it should not have been a bargain based upon what was required of the court. The other issues presented in this case relate to some other guidelines issues as well. In this case, the question arises of whether or not there's sophisticated means. This case on paper seems to be a little more complex than it really was. It was a defendant who had set up a corporation, solicited investments in that corporation, and ultimately used, or as proven in the court, ultimately used the corporation's kitty for his own personal gain. What is clear is that is not the type of sophisticated means that were contemplated in Section 2B1.1. The common note is clear that there has to be something a little bit more than merely setting it up. He didn't set up a foreign corporation. He didn't hide the headquarters of his corporation, but rather this corporation was set up in order to achieve a goal of obtaining these investments. Well, he kept lying to these people. Didn't he fabricate earnings statements or falsify earnings statements? I believe what he did was he was creating updates that he was sending out over e-mails. He had hired some consultant that had given him the advice that when you have these investors and you're not paying them back, show them that maybe there's not a direct return on their investment, but rather that there is some return occurring. We have X, Y, and Z in the pipeline. That, I don't think, falls within what would be traditionally sophisticated to use a mechanism that every individual probably in this courtroom has used a couple times today. He had six different bank accounts that he moved the money around in. It took a forensic accountant to unravel all of this. There was a forensic accountant. Now, part of the issue with that was there were a couple of corporations that he did start throughout the course of the case they were analyzing, but I do believe those six were related to Wynn Plus. Nevertheless, the corporation, the means by which it was, well, I'll get back to the bank account issue. I believe that was the issue in Valdez was that the individual. All I can say is any fellow who was able to persuade the jewelry saleswoman from whom he was buying a $76,000 engagement ring that she ought to invest in this venture that didn't even exist is a pretty slick, sophisticated customer to me. Well, I think as we noted in our brief, it is very clear that there is always going to be some type of sophistication in the practice of deceit. This judge at sentencing said, this guy is the archetypal con man, wouldn't believe a word he ever said. That was part of the commentary that she did make at sentencing. There were some issues that occurred throughout the course of the case and some filings that I think she found questionable. Did you argue at sentencing on the offset point that the Morgan Branch success had led to monies back to the victims or was that not in the record? I believe that was part of the intended loss objection that was made. So when they were calculating a loss in this case, they were actually looking at the actual loss incurred by the investors, but that was not the proper analysis because money had been paid back and that there were legitimate business expenses. Actual loss relates more to the subjective intent of the defendant, whereas here it appears his subjective intent was to make as much money as possible and pay back what he could, but the subjective intent wasn't necessarily to cause $3.39 million in loss. Really, the intended loss should have been the proper analysis because ultimately the calculation should have reflected the fact that there was a portion of time when this corporation was functioning as a legitimate business and that there were legitimate business expenses incurred as part of that. In your best case, that those would be offset? You cited Sanders, but I don't truly judge. I think Sanders may be our best case, and it does have some flaws. But I think the commentary or the comment note contained in 2B1.1 is really the critical analysis as well as looking at the subjective intent and looking at ultimately what was intended here, I think, is the frame through which it should have been presented. Now, if this Court, I think I did note in the brief, if this Court determines that the 2015 Guideline Manual should have applied, that point would be moved. Additionally, we have presented an issue related to whether or not Mr. Spalding should have registered as a broker. There was an enhancement because there was some concern that, or it was found that he was engaged in the sale of securities, which would require him to register as a broker under Title 15 of the U.S. Code. What is clear here is he was soliciting investment. I thought that argument, though, has the problem the first one did, right? It does share a similar issue. I don't think the language used by the attorney was so clear. I think certainly plain error is something this Court should consider for that. The language used by the attorney in that case, I think, is the issue there, whereas he is a bit more equivocal in his statement. I think his statement is to the effect of, I understand the law here, Your Honor. And I'm not going to necessarily argue this, but I don't think his language is sufficient to affirmatively waive the right of the defendant to have that heard. What sentence impact would that? That was just two. It would be two levels, and so I believe that would be starting at 168 to 210 months, I believe. It would be a Level 35, Category 1. I'd have to double-check that. Okay. Overall, there are some issues in the sentencing, but I think they're the same. On the other issues, sufficiency and suppression, you just want to rest on your brief? As far as those go, I would rest on the brief in part. I would note for the Court, as far as sufficiency goes, there's actually a number of issues, Judge. There's sufficiency of the evidence. As far as sufficiency goes, there has to be an intent to defraud or harm, and there has to be an artifice or scheme to defraud at the time that the investment was made in this case, which I think is problematic. Moreover, I think as far as the— But all that evidence was given to the jury. Morgan Stanley and his arguments were all presented. They were all presented. That is correct, Your Honor. Additionally, we have— Did they argue to the jury that he was just an optimistic visionary? I believe that was, at least in the shadows of the evidence that was presented, was that there was some foolishness involved and he was optimistic, and I think the sentencing judge did consider that. But didn't he have a prior fraud conviction? I don't believe he had a prior fraud conviction. I'd have to double-check that. Maybe you're thinking of another case. I believe that there were prior legal proceedings in the civil courts in the state of Texas that related to that. And he was sued a number of times by people involved in this case. Further, I think that there is an issue with the statements that were presented as part of the government's exhibit relating to a deposition that was taken. That was the crux of the motion to suppress in this case. And in the motion to suppress, there is this— or in the transcript of the deposition, there is this attempt by the defendant to make it clear that he is uncomfortable answering this. He's trying to assert some type of privilege. And I think the exact language he uses is attorney-client privilege. That testimony was never introduced, right? It was never introduced. However, it did prevent him from ultimately testifying in the case because that evidence would have been able to come out and would have prevented him from taking the stand and not being impeached by it. We don't really know whether it prevented him or not, do we? We don't necessarily know that for certain. The record is a little bit sparse on that issue. It would have been a lot more helpful if there had been some declarative statement, but I think that there is an inference that can be raised. Was he represented by retained or court-appointed counsel at trial? At trial, he was court-appointed counsel. It was the public defender's office. And at sentencing, he was represented by retained counsel. And does the Court have any further questions for me? Thank you. Go ahead, sir. May it please the Court. Brian Portugal for the United States. I'd like to speak first about the evidentiary challenge or the challenge to the sufficiency of the evidence to support Count 4 of the indictment. That was the bankruptcy false statement involving the relationship between the investors and the Win Plus entities. The appellant challenges the sufficiency with respect to the use of the word substantial, with respect to the representation that there were 20-plus note holders, and with respect to the statement that those note holders were limited to the time periods of 2004-2005. First, with respect to a substantial number of note holders being repaid, if you review Government's Exhibit 198, I think you will see that that number that were paid back during that period is at most about nine, and that also depends upon whether you consider that promissory notes were merged with successive investments. For example, one of the investors, Mr. Kershaw, his subsequent promissory note where he was investing more money makes clear on its face that it subsumes the prior promissory note. So with respect to some of these investors, if you consider that they're being subsumed, well, then even some of those nine aren't paid back. But if the answer is substantial or approximate, why doesn't the law, the false statement law, require you to follow up and say, well, when you say 20-plus, do you mean 97 or do you mean 20 to 30? How do you have a literally false answer when you add those qualifiers that may be seen as evasive? Because part of the charge, Your Honor, is for the jury to assess an intent by that statement to deceive, and the jury was properly instructed as to count four and correctly found that when Mr. Spaulding made the statement that a substantial number had been repaid, he intended for that to be false and to severely underrepresent the number who had been repaid. So Braunston is always a jury question? No, it's not always a jury question, Your Honor, but Braunston only comes into play when the answer is not responsive. So here the bankruptcy trustee asked Mr. Spaulding, can you describe the relationship? And his answer was responsive. It was probative of the relationship between the note holders and the entities. And all courts have agreed that that's the critical element for Braunston, is that it has to have been nonresponsive? Well, certainly this court has, Your Honor. Remind me of that case. I'm sorry. I think that's the reading of Fulbright and or Abrams. Fulbright, yeah, that's right. Okay. And certainly the Second Circuit, which is the circuit that was the genesis of Braunston. Yeah, okay. Thank you. With respect to the 20-plus note holders, again, I'll refer you to a government exhibit, and that's number 224. Just a review of that exhibit, and I came up with at least 60 note holders, or 60 investors limited to the time period of 2004-2005. There were many, many more, and certainly the time period of the investments was not limited to 2004-2005. So that portion of the answer is also false. For the same reason as I discussed with you, Judge Higginson, about the Braunston rule being an opposite, it was likewise an opposite as to the jury instructions. There was no requirement the jury was correctly instructed by Chief Judge Lynn that something that is true cannot be fraudulent. I'm happy to answer the court's questions on any of the other issues. I just have two quick ones since you invited. Two areas of law that have always been a little confusing that may seem implicated a little bit here. One is summary chart, and the other is offsets. So on the summary chart, was the chart, did the chart, I couldn't find it, and I need to look harder, but the actual chart that you presented, was there a column that said these monies are business and these are personal? That's correct. But if that column exists, that's not really a summary of voluminous writings. That's not a 1006 summary chart. That would be a 611 summary of the witnesses' statements, right? It is, but it's necessary with respect to referring to the individual account entries. In other words, it's a – So I guess I'm saying you offer a chart to a jury, and I take it they took it back as evidence. It wasn't just a demonstrative chart. That's correct. The only basis offered for that, if it were 1006, which comes in as evidence, would just be summary of voluminous writings. But if what you've done is mix two charts together, one is voluminous writings, the data, but then also a column that reflects the witnesses' statements, unless I'm wrong, that column wouldn't be evidence. Well, it is evidence of the analysis that the forensic accountant undertook. I was going to say, if some of the checks were for a maid and a gardener and jewelry and others of the checks were clearly business-related, that wouldn't be improper, would it?  But if the court did perceive error, I submit, for the reasons expressed in the brief, that it's more than harmless, given the underlying testimony of the forensic accountant. These charts are very powerful and used, and I've just never quite understood the line between 1006 that's evidence and a 611 demonstrative that's reiterating what a witness said. Then it makes sense to put them together. I don't see it as teased out. Just quickly, the other thing on offsets. If I read your brief correctly, you implied that if services had been rendered, and then you had parentheses none here, an offset might be due. So what's the limiting principle? Let's say he has a business that eventually ends up defrauding a lot of people, but it happens to succeed once, that Morgan Branch adventure. Is the entire business a loss, or do you have to offset it for whatever actual business related to the successful endeavor he had in alternate energy? I think the demarcation, Your Honor, is between a legitimate business and perhaps a scenario where there's an embezzlement, and a purely fraudulent business. From the start. From the start, which is what Win Plus was from the beginning. So he got lucky on the Morgan Branch? Last question. In essence, he really did, Your Honor. And if you read the testimony of Tom Carboni, and if you read the defendant's own witnesses who testify about this Padoma entity looking into buying Morgan Ranch, Mr. Spalding really succeeded in spite of himself. And I think it was a fair inference for the jury that with Ray Booth and Tom Carboni actually being there and being legitimate consultants, that Mr. Spalding had a powerful incentive to get something out of this and at least make it appear to the consultants that the business was legitimate in addition to just bringing in more revenue into the entity, which he then stole. He didn't itemize offsets, did he? He didn't really say X amount of this are actually legitimate expenses, right? No. As I understand, his only point was that he should only be, the loss amount should only be what he actually diverted and not. That's my point because for sentencing purposes, it would have been up to him to prove what the offset. I mean, we've encountered this in the Medicare cases quite a bit. That's absolutely correct, Judge Jones. Well, so that's a narrow way to get at it. Sure. The other thing that struck me is by having those well-recognized experts, it was holding the company out to the investors as being more legitimate than it really was. Certainly, certainly. That was it for me. The only thing, well, I have one question about the fact, you know, using the change in the guidelines as a bargaining chip. There is no question that the guidelines in the last few years have tended to trend downward in the severity and that that would create an incentive for a defendant to try to go down. But on the other hand, why is that a legitimate thing for the court to bring up as opposed to the government? You see what I'm saying? I'm not sure I do. Well, the court, as I understand it, he asked for a continuance, and the court said to him, only if you will agree that we'll use these guidelines, not the incoming guidelines. Now, if the court had been running late on her sentences, she could have said, is it okay for us to use the later? I mean, don't courts do that sometimes or not? They do, and I think having read the trial record and knowing that Chief Judge Lynn sat through the entire trial, I think, and her experience with Mr. Spaulding, especially the grounds for the motion to continue, made her suspect that he might be trying to obtain a continuance just for that purpose, to obtain a lower level under the loss amount. Well, the government didn't oppose continuance, did it? I think that it—I'd have to double check. I think that the government did oppose it because Mr. Spaulding was seeking a continuance in an effort to participate in another venture which he represented was going to result in paying back some of the victims. One more chance. One more chance, and he was reaching out to victims. They were coming in and saying that, right? Yes. They wanted leniency. Well, but again, but the government didn't say, we think he's trying to game the guidelines. I don't think so, no. Yeah, so that's why I'm just— obviously the Sentencing Commission is going to create these opportunities for gamesmanship. If they went up, it would be the opposite. I just think it's interesting because, you know, we can talk all we want to about the goal of uniform sentencing, but if they're going to change the goalposts every two years, there's nothing uniform about it. At the time the continuance was granted, had the objections been made to the PSR and had the court— had the system gone through all of that before the continuance was granted? I think that's correct, Judge Davis. So we'd have to start all over with that. That's right. If the court has no further questions, I'll rest on my brief and ask you to affirm the judgment below. Thank you. All right, sir. Thank you. Mr. Newman, rebuttal. Just briefly, Your Honors. With regard to the guidelines, I do think that there is one point that I did want to get out that I overlooked and do want to make clear now. What is clear is that the district court's actions in this case materially changed this court's ability to review the sentence in the case. It goes from being a presumption of unreasonable or at least not having the presumption of reasonableness to the sentence in this case now has the presumption of reasonableness because it is a below-the-guideline sentence. And if it had been the reverse and the court had started with the 2015 guidelines and ultimately switched those guidelines and considered the 2014 guidelines as well, there would be an argument that this doesn't comport with the statutory requirements of 3553 and that the court gave significant weight to an improper or irrelevant sentencing factor, which would have been the previous year's guidelines. I think that that's certainly problematic. And my recollection of the record is the U.S. Attorney's Office did not take a strong stance one way or the other as to whether or not a continuity should have been granted. I think they deferred to the court quite a bit in the case. Why did he get a downward departure at all, downward variance, if the court was saying you're the worst comment I've seen? Is that in the record? It isn't. I think it was partially because the court did consider the new guidelines as they applied. And so that was one of the statements the court did make. I think the government has the exact quote in their brief on 0.6 subsection B in their brief. And so that is part of it. Nevertheless, it did wind up to be above the guideline sentencing range that would have been applied had the 2015 guidelines been utilized by about 12 months. And because of the switch in the presumption, it made it difficult to appeal. Not only that, but because of the court's own initiative in the case, it made it difficult for counsel to have objected to that issue. If there are no further questions from the panel, I yield the remainder of my time. Do you realize that you're court appointed and you've done a good job with a very difficult case? We appreciate it. Thank you, Your Honor. All right, sir.